# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

Jack W. Simpson,

                    Plaintiff,

v.                                               Case No.  3:01-cv-354
                                                 Judge Thomas M. Rose

The Mead Corporation,

                    Defendant.

---

### ENTRY AND ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD, (DOC. 30), DENYING PLAINTIFF'S MOTION FOR JUDGMENT, (DOC. 27), AND TERMINATING CASE.

---

This matter is before the Court for decision on cross-motions for judgment between Defendant the Mead Corporation and Plaintiff Jack W. Simpson, who is a former employee of Mead. While working for Mead, Simpson participated in deferred compensation programs the first of which was known as the Mead Management Income Parity Plan (MMIP), instituted in 1982. The Mead Supplemental Executive Retirement Plan (SERP), replaced the 1982 plan in 1985; and in 1992 Mead revised the SERP.[1] Plaintiff's Amended Complaint alleges five causes of action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*: (1) recovery of plan benefits under the 1982 Mead Management Income Parity Plan; (2) recovery of plan benefits under

---

[1] There were revisions to the plan in other years, but since no party contests that any of these govern the instant controversy, the Court considers them irrelevant to this opinion and will ignore them.

the "1985 Summary Plan Description"; (3) recovery of plan benefits under the 1985 Supplemental Executive Retirement Plan; (4) failure to timely produce plan documents pursuant to 29 U.S.C. § 1132(c)(1)(B); and (5) attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1). Doc. 23. Plaintiff decries not so much that he has been absolutely deprived of pension benefits, but that he was not allowed to begin receiving them at age 55 and forced to wait until age 62 before receiving them.

Defendant contends that Plaintiff is not entitled to early retirement benefits; that, even if he is, he is precluded from pursuing his claim here due to Plaintiff's failure to exhaust administrative remedies; and that Plaintiff's claim of failure to provide plan documents is barred by the statute of limitations. The Court will excuse Plaintiff's failure to exhaust due to Defendant's failure to provide plan documents in a timely manner. Nevertheless, the Court awards judgment to Defendant on the first three claims on the merits, agrees that the statute of limitations bars the fourth claim, and declines to award attorney fees.

## I.    Background

In 1982, Mead recruited Plaintiff Jack W. Simpson from IBM, where Simpson had worked for 19 years, to be President of Mead Data Central. Simpson began with Mead on June 21, 1982. Three years later, on July 1, 1985, he became eligible for and elected to participate in "The Mead Management Income Parity Plan." The plan was a benefit designed to assist Mead in "recruit[ing] mid-career executives who could not earn adequate retirement benefits under the [ERISA] qualified retirement plans of the Company because they will have limited credited services at retirement." Doc. 14, Ex. C., Art. I. In 1985 the plan, with minor amendment, was renamed the "Supplemental Executive Retirement Plan" and amended again in 1992.

On November 2, 1992, after ten years of service, Mead informed the 51-year-old Simpson that he was relieved of his duties and his employment would be terminated.  Doc. 14, Exs. R & S. The termination letter informed Simpson, "You are vested in the…Mead Supplemental Executive Retirement Pension.  You may elect to receive benefits…under the latter plan at age 62."  Doc. R. Negotiations were held between the parties, which bore fruit in the form of a negotiated severance package, in which the parties agreed, "This agreement will not affect your rights under…the Mead Supplemental Executive Retirement Plan."  Doc. S.

On July 29, 1993, Simpson sent a letter to the plan administrator, requesting that Mead consent to the commencement of SERP plan benefit payments at age 55 rather than age 62, pursuant to the financial hardship provision of the 1992 plan.  Doc. 14, Exs. T and Q, p. 11, Art. 4.6.  To support his request to the plan administrator for early payments, Simpson attached the 1992 plan and its Summary Plan Description as an exhibit to his letter.  Doc. 14, Ex. T.  The plan administrator denied Simpson's request, informing him of his right to appeal within 60 days.  Ex. Z.  Simpson did not appeal the administrator's denial.

Approximately five years later, on July 24, 1998, the now 56 year and 11 months old Simpson questioned a new plan administrator about several benefits issues, including commencement of plan benefit payments at age 55, since he had turned 55 in 1998.  Simpson urged that, in fairness, the 1992 plan, which took effect shortly before he was terminated, should not apply to him, since, he alleged, the changes were aimed at him personally.  Mead again refused his request. Ex. U.  The plan administrator's November 18, 1998 letter explained:

> You clearly have the right to make an appeal under the terms of the plan.  As I have read the various documents and considered the notes you've sent, the basis for your appeal would be based on the assertion that the changes to the plan in 1992 were made specifically to

preclude you from taking a lump sum distribution prior to age 62.  I
don't believe this option is a viable one, however, the right is yours
to pursue.  My rationale follows.

I have reviewed the various SERP documents, the Compensation
Committee meeting minutes of July 22, 1992 (which included the
proposal to change the SERP) and have spoken with Jerry.

We do not find anything to support that the changes to the SERP
were directly or indirectly connected to your subsequent termination.
On the contrary, the decision was apparently driven by a previous
termination that had resulted in a SERP distribution, followed by the
individual going to work for a competitor.

Therefore, I don't think there is any basis for your claim from a plan
interpretation standpoint:

    1.    The current plan (effective 7/22/92) is clear that
        benefits are payable at age 62 for individuals who
        terminate before age 55.  There is no other option.

    2.    Your last day of employment was on 11/23/92, at
        which time you were 51 yrs., 3 months of age.

Ex. V.  This November 18, 1998 letter also mentions "I am also enclosing the *complete* Plan text,

as you requested previously."  *Id.*  Simpson responded to this letter with a email that evinced an

intent to file an appeal, based in part on a claim that a prior version of the plan applied to him.  Ex.

A-1.[2]  On January 26, 1999, Simpson renewed his request for plan documents, "I will need copies

of the legal text of the plans so that I can see how they changed over time from my start in 1982."

Ex. A-1.

––––––––––––––––––––

    [2] The exact date of this email is unclear.  Paragraph seven of Simpson's affidavit clarifies that
page 1 of Exhibit A-1 is not a cover for the pages that follow.  Page one, dated November 20, 1998,
states, "This fax provides an exhibit for that."  The first three pages that follow may be the January
26, 1999 email referenced in Simpson's affidavit attached to docket entry 19.  The pages that follow
the January 26, 1999 missive appear to be a later-sent response.  These three documents would have
been better designated as three separate exhibits.

Simpson points out that it was not until September 26, 2000, that Mead provided Simpson with a copy of the 1982 Plan. Mead had difficulty locating it, as no one realized that the 1982 plan was not named "Supplemental Executive Retirement Plan," like its successors, but "The Mead Management Income Parity Plan." It appears that, at some later point in 2000, Simpson wrote a letter to Mead's corporate counsel arguing that the 1982 plan applied to him.[3] The Court finds that the letter to Mead's corporate counsel is neither a new claim with the plan administrator, nor an appeal of the prior decision.

On January 5, 2001, Mead's corporate counsel responded to Simpson's request that he be granted early retirement benefits by asserting that the plan in effect when Simpson first qualified for benefits was the 1985 plan, and that Simpson did not qualify under the 1985 plan.[4] Mead explained that Simpson did not first qualify for benefits under the 1985 plan because the plan had been amended "effective January 1, 1985." Ex. X.

On July 30, 2001, Simpson filed an action in the Court of Common Pleas of Montgomery County, Ohio. Doc. 1, Ex. A. Therein, Simpson alleged breaches of contract and breach of fiduciary duty, but did not reference ERISA. *Id.* On August 27, 2001, Mead removed the action to federal court on the basis of federal question jurisdiction on the theory that Simpson's claims were

---

[3] Simpson asserts that he renewed his claim for early retirement benefits to the plan administrator in September of 2000, doc. 28 at 12, and refers the Court to Ex. C-1, but this exhibit is an email exchange wherein Simpson informs the company that the 1982 plan can likely be found under the old name, and the company responds to confirm their success in finding the document under this name. Another Simpson court filing asserts that, when Simpson received the copy of the 1982 plan, "the sixty day period was long passed, and the legal issue was resolved by referring it to Mead's highest legal officer, who rendered her decision on January 5, 2001." Doc. 18 at 4.

[4] The Court finds that Mead did not concede that the 1985 plan governs the dispute, but rather argued that, assuming *arguendo* that the dispute is governed by the plan in place when Simpson qualified for benefits, then the 1985 plan would govern.

preempted by ERISA.  Doc. 1.  Simpson moved the Court to grant him judgment on his state law claims.  Doc. 14.  In response to the motion, the Court granted Simpson thirty days to amend the complaint to assert any possible claims arising under ERISA, which Plaintiff did.  Plaintiff's Amended Complaint alleges five causes of action, the first three of which are brought pursuant to 29 U.S.C. § 1132(a)(B): (1) recovery of plan benefits under the 1982 Mead Management Income Parity Plan; (2) recovery of plan benefits under the "1985 Summary Plan Description"; (3) recovery of plan benefits under the 1985 Supplemental Executive Retirement Plan; (4) failure to timely produce plan documents pursuant to 29 U.S.C. § 1132(c)(1)(B); and (5) attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1).  Doc. 23.  The parties have filed cross-motions for judgment.  Docs. 27 and 30.  *Wilkins v. Baptist Healthcare Sys. Inc.*, 150 F.3d 609, 619 (6th Cir. 1998) (Gilman, J., concurring).

## II.     Standard of Review

When an ERISA plan administrator's decision to deny benefits is brought before a court for review, the court engages in *de novo* review, unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). No party has argued that any of the plans in the instant case create discretionary authority for the plan administrator in administering the plan.  Therefore, the Court will apply *de novo* review.

## III.    Analysis

As an initial matter, the Court finds that the 1982 Mead Management Income Parity Plan, like the SERP versions that replaced it, was a "top hat" pension plan under ERISA. A top hat plan is a "plan which is unfunded and is maintained by an employer primarily for the purpose of

providing deferred compensation for a select group of management or highly trained employees."

*Goldstein v. Johnson & Johnson*, 251 F.3d 433, 436 (3d Cir. 2001); see also *Miller v. Eichleay Eng'rs, Inc.*, 886 F.2d 30, 34 n.8 (3d Cir. 1989).  The Mead Management Income Parity Plan, like the SERP versions that replaced it, proclaims itself "an unfunded supplemental retirement plan to provide deferred compensation to a select group of management employees of the Company," ex. C at Art. 1, that is, a "top hat" plan.

Congress established the top hat category to deal with the less frequently encountered benefits granted to high-ranking executives:

> Though Congress also chose to exempt top hat plans from ERISA's vesting and funding requirements, its rationale for so doing differed from its rationale for exempting welfare plans.  Whereas employee welfare plans were exempted because of the expense of maintaining and administering such plans, top hat plans were exempted on the premise that the employer's top-level executives have sufficient influence within the institution to negotiate arrangements that protect against the diminution of their expected pensions.  Thus, [the Department of Labor] has stated that in providing relief for "top-hat" plans from the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and, therefore, would not need the substantive rights and protections of Title I.

*Gallione v. Flaherty*, 70 F.3d 724, 728-29 (2d Cir. 1995) (citing DOL Office of Pension & Welfare Benefit Programs, Opinion 90-14 A, 1990 WL 123933, at *1 (May 8, 1990)).

Top hat plans, however, are "employee benefit plans" as defined by ERISA and are therefore subject to the enforcement provisions of the statute, including § 1132(a), which creates a cause of action.  See *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 468 (6th Cir. 2002) (citing *Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 286-87 (3rd Cir. 1995) (deferred compensation plans are exempt from

much of ERISA's regulatory scheme, but are covered by the definitions and enforcement provisions of ERISA.)).  While subject to ERISA's enforcement provisions, top hat plans are expressly exempted from ERISA's anti-cutback provision.  *Cogan v. Phoenix Life Ins. Co.,* 310 F.3d 238, 242 (1st Cir. 2002) (citing *Demery v. Extebank Deferred Comp. Plan (B),* 216 F.3d 283, 287 (2d Cir. 2000)).  Thus, top hat plans are generally unilateral contracts which, in ERISA actions, courts interpret according to federal common law contract principles.  *Kemmerer,* 70 F.3d at 287; see also *Spacek v. Maritime Assoc.*, 134 F.3d 283 (5th Cir. 1998).  As unilateral contracts, top hat plans create vested rights in those employees who accept the offer contained in the unilateral contract by executing the performance required in order to qualify for a particular benefit.[5]  *Kemmerer,* 70 F.3d

---

[5] Defendant asserts that under *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998), "ERISA plans may be reduced, modified or terminated by the employer, at any time for any reason." Doc. 28 at 9.  *Sprague*, however, involved an ERISA welfare plan, and not an ERISA pension plan. Top hat plans must be determined to be either ERISA welfare plans or ERISA pension benefit plans on a case-by-case basis.  See *Kaelin v. Tenneco, Inc.*, 28 F. Supp. 2d 478, 484 (N.D. Ill. 1998); see also *Long v. Excel Telecommunications Corp.*, 2000 WL 1562808, *4 (N.D. Tex. 2000) ("top-hat plans do not constitute a third class of ERISA plans,…court[s] inquire[] instead whether [a] plan could be considered either an ERISA employee welfare benefit plan or an employee pension benefit plan."). Considerations that make a plan an ERISA pension benefit plan include: a set vesting schedule, a provision for systematic deferral of payments to the termination of employment or beyond, and creation for the express purpose of providing retirement income.  *Long v. Excel Telecommunications Corp.*, 2000 WL 1562808, *4 (N.D. Tex. 2000).  The Mead plans require 36 months of service, defer payments, generally, to the term of employment or beyond, and were created to provide an unqualified ERISA benefit for "mid-career executives who could not earn adequate retirement benefits under the [ERISA] qualified retirement plans of the Company because they will have limited credited services at retirement." Doc. 14, Ex. C, Art. I.  Thus, the Court considers the plans under review to be ERISA pension plans.

*Sprague* is thus of questionable relevance.  The only published Sixth Circuit opinion to even mention "top hat" plans is *Wolcott v. Nationwide Mut. Ins. Co.*, 884 F.2d 245, 251 (6th Cir. 1989). *Wolcott*, however, hinges on whether the plaintiff was an "employee."  The only unpublished case to mention "top hat" plans is, *Plazzo v. Nationwide Mut. Ins. Co.*, 892 F.2d 79, 1989 WL 154816, *3 (6th Cir. 1989), which is "virtually indistinguishable from *Wolcott*."  *Plazzo*, at *3.  *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 468 (6th Cir. 2002) analyses a top hat plan without using the term, and relies upon the Third Circuit case of *Kemmerer*.  This Court will, likewise look to *Kemmerer* and its

at 287. "Under unilateral contract principles, once the employee performs, the offer becomes irrevocable, the contract is completed, and the employer is required to comply with its side of the bargain." *Id.*; see also *Lund v. Citizens Financial Group, Inc.*, 1999 WL 814341, *19-20 (D.N.H. 1999). Employees may bring an action under § 1132(a) to enforce these unilateral contracts.

## A.    Claim I.

Simpson's first claim for relief asserts that, under the 1982 plan, he was entitled to receive monthly payment of $9,180.15 beginning with his 55th birthday in August 1996. Doc. 23 at 4-5. This claim presupposes that the 1982 plan gives any rights to Simpson in 1998. Simpson argues that it does, as this is the plan he believes was in effect when he first qualified for participation as a Mead Eligible Executive. Mead counters that it had reserved to itself the power to amend the contract at any time.

The 1982 plan did contain language concerning Mead's power to amend:

> *9.1 Amendment and Termination.* The Company expects the Plan to be permanent, but since future conditions affecting the Company cannot be anticipated or foreseen, the Company must necessarily and does hereby reserve the right to amend, modify or terminate the Plan at any time by action of the Board of Directors of The Mead Corporation.
>
> * * * * * * * *
>
> *9.3 Protected Benefits.* If the Plan is revoked before its Effective Date, it shall nevertheless be effective with respect to all Eligible Executives who meet the requirements of participation contained in section 3.1. If the Plan is terminated or revoked the full benefit earned by each retired Eligible Executive and beneficiary shall not be reduced. An Eligible Executive who is in active service at the time of Plan termination or revocation shall be entitled to full benefits under the Plan, however, his earnings for periods subsequent to such

_____

progeny.

> termination or revocation shall not be used in determining Final
> Average Earnings.  The time and manner of payment of benefits
> subsequent to such date shall remain subject to the terms and
> conditions of the Plan.

Ex. C at 8.

While Mead asserts that the reservation of the "right to amend, modify or terminate the Plan at any time" allows them to amend the plan at any time, other courts have rejected similar contentions: "[E]ven when a plan reserves to the sponsor an explicit right to terminate the plan, acceptance by performance closes that door under unilateral contract principles (unless an explicit right to terminate or amend after the participants performance is reserved). 'Any other interpretation…would make the Plan's several specific and mandatory provisions ineffective, rendering the promises embodied therein completely illusory.'" *Kemmerer*, at 287-88 (quoting *Carr v. First Nationwide Bank*, 816 F. Supp. 1476 (N.D. Cal. 1993)); see also *In re New Valley Corp.*, 89 F.3d 143, 151 (3rd Cir. 1996).  While this Court finds the magic words approach of *Kemmerer*, which allows companies to retain the right to amend a top hat plan after performance when the contract explicitly reserves the right to amend "even after performance," but not if it only reserves the right to do so "at any time," hypertechnical, there is no caselaw contrary to *Kemmerer*.  This Court being unable to perceive a superior approach will adopt the logic of *Kemmerer*.  This Court finds that the logic regarding terminations of plans pertains equally to Mead's right to amend the contract after an employee becomes an "Eligible Exercutive."  Once a Mead Eligible Executive has been in a designated position for at least 36 consecutive months, the company may no longer alter the Plan as regards that employee.  Ex. C, Art. 2.

The 1982 plan was open to "Eligible Executives," which is defined as those who had completed 36 months of consecutive service with Mead.  Ex. C, Art. 2.  Simpson began work with

-10-

Mead in June of 1982, and thus did not complete 36 months of continual service with Mead until July 1, 1985. Mead was free to revise or amend the 1982 plan with respect to Simpson until July 1, 1985. The 1982 version of the plan was amended effective January 1, 1985. Ex. D. at 1. Simpson points out, however, that the 1985 plan that is in the record was signed "this 25 day of August 1986, but effective as of January 1, 1985," that is, more than a year after Simpson's rights in the 1982 plan would have become unrevocable Ex. F at 12. Yet another layer of analysis reveals that, on April 23, 1985, three months before his 36-month anniversary, Simpson was given what appears to be a Summary Plan Description of the 1985 plan, describing the 1982 plan as revised effective January 1, 1985. Ex. D.[6] Thus, there is a document three months before the 36 month anniversary referring to the plan as having been amended, but no document actually doing so until more than a year after Mead would have been foreclosed from amending the plan with regard to Simpson. The document that amends the plan, however, purports to do so at an effective date prior to Simpson's having become eligible to participate in the plan.

Simpson did not raise the issue of some version of the plan other than the 1992 governing his rights before the plan administrator; this idea was first mentioned in a December 4, 2000 letter to Mead's Corporate Counsel. Because the question was never presented to the plan administrator, there is nothing in the administrative record on this matter for the Court to review. See *Wilkins v. Baptist Healthcare Sys. Inc.*, 150 F.3d 609, 619 (6th Cir. 1998) (Gilman, J., concurring) ("As to the merits of the action, the district court should conduct a *de novo* review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly.").

---

[6] The Summary Plan Description would likely control the plan itself. See *Sprague*, 133 F.3d at 400 (citing *Edwards v. State Form Mut. Auto. Ins. Co.*, 851 F.2d 134, 136 (6th Cir. 1988).

The 1982 plan did explain what steps were expected of Simpson to perfect his claims:

*6.2 Claims Procedure.*  If benefits are denied or forfeited, in whole or in part, the following claims procedure shall be applicable:

*(a)* The Administrator will provide the claimant with a written notice of denial, setting forth (i) an explanation as to why the claim was denied or benefit forfeited, (ii) the provisions of the Plan upon which the denial or forfeiture was based, and (iii) an explanation of the Plan's claims procedure.  If the Administrator does not deny a claim on its merits, but rejects the application for failure to furnish certain necessary material or information, the written notice to the claimant will explain what additional material is needed and why, and advise the claimant that he may refile a proper application.

*(b)* Within 60 days after the receipt of the Administrator's notice of denial or forfeiture, the claimant may file a written notice of appeal of the denial or forfeiture of benefits with the Committee.  In addition, within such appeal period, the claimant may review pertinent documents at such reasonable times and places as the Committee may specify and may submit any additional written material pertinent to the appeal not set forth in the notice of appeal.  The appeal shall be determined by a panel of three persons designated by the Committee, and the claimant shall be entitled to appear before the panel to present his claim.

*(c)* The panel will make a written decision on the appeal not later than 60 days after its receipt of the notice of appeal, unless special circumstances require an extension of time, in which case a decision will be given as soon as possible, but not later than 120 days after receipt of the notice of appeal.  The decision on the appeal will be in writing and shall include specific reasons for the decision, making specific reference to the provisions of the Plan upon which the decision was based.

In the event the Administrator fails to take any action on the claimant's initial application for benefits within 90 days after receipt, the application will be deemed denied, and the applicant's appeal rights under the section will be in effect as of the end of such period.

Doc. 28, attach. 1 at 7.[7]

Normally, Simpson would be required to follow this route as a prerequisite to bringing the

instant action:

> "[t]he administrative scheme of ERISA requires a participant to exhaust his or her administrative remedies prior to commencing suit in federal court."  *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991); see also *Baxter v. C.A. Muer Corp.*, 941 F.2d 451, 453 (6th Cir. 1991).  Although ERISA does not explicitly require exhaustion, the statute does require benefit plans to provide internal dispute resolution procedures.  See 29 U.S.C. § 1133(2).  "[T]he exhaustion requirement enables plan fiduciaries to 'efficiently manage their funds; correct their errors; interpret plan provisions; and assemble a factual record which will assist a court in reviewing the fiduciaries' actions.'"  *Baxter*, 941 F.2d at 453 (quoting *Makar v. Health Care Corp. of Mid-Atlantic*, 872 F.2d 80, 83 (4th Cir. 1989)).

*Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 90 (6th Cir. 1997).  The Sixth Circuit has explained the

purposes of exhausting administrative remedies as including :

> (1)     To help reduce the number of frivolous law-suits under ERISA.
> (2)     To promote the consistent treatment of claims for benefits.
> (3)     To provide a nonadversarial method of claims settlement.
> (4)     To minimize the costs of claims settlement for all concerned.
> (5)     To enhance the ability of trustees of benefit plans to expertly and efficiently manage their funds by preventing premature judicial intervention in their decision-making processes.
> (6)     To enhance the ability of trustees of benefit plans to correct their errors.
> (7)     To enhance the ability of trustees of benefit plans to interpret plan provisions.
> (8)     To help assemble a factual record which will assist a court in reviewing the fiduciaries' actions.

*Costantino v. TRW, Inc.*, 13 F.3d 969, 975 (6th Cir. 1994).

Nevertheless, failure to exhaust can be excused:

---

[7] Subsequent plans, including the 1992 plan, are similar.  See Ex. Q, at 14-15, Art. 6.

> Although ERISA's administrative exhaustion requirement for claims brought under § 502 is applied as a matter of judicial discretion, a court is obliged to exercise its discretion to excuse nonexhaustion where resorting to the plan's administrative procedure would simply be futile or the remedy inadequate.
>
> The standard for adjudging the futility of resorting to the administrative remedies provided by a plan is whether a clear and positive indication of futility can be made. A plaintiff must show that it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision.

*Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 419 (6th Cir. 1998) (quotations and citations omitted); see also *Communications Workers of Amer. v. AT&T*, 40 F.3d 426 (D.C. Cir. 1994) ("The futility exception is…quite restricted and has been applied only when resort to administrative remedies is clearly useless.") (quotations and citations omitted).

The Court notes that when Simpson's request for benefits to the plan administrator was denied on November, 18, 1998, ex. V, Simpson had still not yet been provided a copy of the 1982 plan, precluding Simpson from appealing on the basis he seeks to pursue now. Moreover, on January 26, 1999, Simpson renewed his request for this document within the time-frame for filing an appeal. Ex. A-1 ("I will need copies of the legal text of the plans so that I can see how they changed over time from my start in 1982."). The Court finds that this renders the availability of an appeal futile.[8]

Having determined that Simpson's claim is not barred for having failed to exhaust administrative remedies. The Court must resolve the question of what plan applied to Mead. Under the unilateral contract theory, Mead had lost the ability to amend the plan with regard to Simpson

---

[8] The Court makes this finding even if Simpson could have filed a new claim for benefits after he had received and reviewed the 1982 plan.

by August of 1986, when it purported to amend the plan effective January of 1985. Neither does

the informational sheet Simpson received in April 1985 affect this question, because plans may only

be amended by fulfilling ERISA's formal amendment procedures. *Mohalley v. Kendall Health Care*

*Products Co., Inc.*, 903 F. Supp. 1530, 1536 (M.D. Ga. 1995) ("An ERISA plan administrator must

furnish a summary of any material modification in the Plan to each participant. Any modification

or amendment to an existing ERISA plan may not be adopted or applied, however, unless the

amendment is adopted in a formal, complete, and written form." (citing 29 U.S.C. § 1022(a)(1) and

*Smith v. National Credit Union Admin. Bd.*, 36 F.3d 1077 (11th Cir. 1994)). Therefore, Simpson

is correct that the 1982 plan governed his claim.

Finally, then, since the 1982 plan regulates Simpson's claim, the Court must decide if the

1982 plan affords Simpson the benefits he sought.[9] The first provision of the 1982 plan document

_____

[9] The Court notes that "The Plan shall be governed by and construed according to the law of
the State of Ohio." Ex. C, at 8, Art. 10.1. Under Ohio law:

> "When confronted with an issue of contractual interpretation, the role
> of a court is to give effect to the intent of the parties to the agreement.
> *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.* (1999), 86 Ohio St.
> 3d 270, 273, 714 N.E.2d 898, citing *Employers' Liab. Assur. Corp. v.*
> *Roehm* (1919), 99 Ohio St. 343, 124 N.E. 223, syllabus. See, also,
> Section 28, Article II, Ohio Constitution. We examine the insurance
> contract as a whole and presume that the intent of the parties is
> reflected in the language used in the policy. *Kelly v. Med. Life Ins.* Co.
> (1987), 31 Ohio St. 3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph
> one of the syllabus. We look to the plain and ordinary meaning of the
> language used in the policy unless another meaning is clearly apparent
> from the contents of the policy. *Alexander v. Buckeye Pipe Line Co.*
> (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph
> two of the syllabus. When the language of a written contract is clear,
> a court may look no further than the writing itself to find the intent of
> the parties. *Id.* As a matter of law, a contract is unambiguous if it can
> be given a definite legal meaning. *Gulf Ins. Co. v. Burns Motors, Inc.*
> (Tex. 2000), 22 S.W.3d 417, 423. On the other hand, where a contract

that is relevant to Simpson's claim surfaces in what is described as "a non-technical presentation of the Mead Management Income Parity Plan." Ex. C at 4. The same paragraph continues to explain "[t]he plan will be administered in accordance with the legal document which establishes and describes it. In the event of any discrepancy between the explanations in this material and the legal text, the terms of the text shall govern." *Id.* This non-technical portion informs the participant of the possibility of early retirement benefits:

> When will benefit payments actually begin?
>
> *A. Basic Retirement Benefits.* You'll begin to receive your basic retirement benefit when you terminate your employment with Mead on or after your 62nd birthday. Retirement may be deferred to age 70, but not beyond age 65 for those who qualify for exemption as

---

> is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent. *Shifrin v. Forest City Enterprises, Inc.* (1992), 64 Ohio St. 3d 635, 597 N.E.2d 499. A court, however, is not permitted to alter a lawful contract by imputing an intent contrary to that expressed by the parties. *Id.*; *Blosser v. Enderlin* (1925), 113 Ohio St. 121, 148 N.E. 393, paragraph one of the syllabus ("there can be no intendment or implication inconsistent with the express terms [of a written contract]"). It is generally the role of the finder of fact to resolve ambiguity. See, e.g., *Davis v. Loopco Industries, Inc.* (1993), 66 Ohio St. 3d 64, 609 N.E.2d 144. However, where the written contract is standardized and between parties of unequal bargaining power, an ambiguity in the writing will be interpreted strictly against the drafter and in favor of the nondrafting party. *Cent. Realty Co. v. Clutter* (1980), 62 Ohio St. 2d 411, 413, 16 O.O.3d 441, 406 N.E.2d 515.

*Water Works Supplies, Inc. v. Grooms Constr., Co., Inc.* 2005 WL 674481, *4 -5 (Ohio App. 2005). The parties here, however, are not of unequal bargaining power. *Gallione v. Flaherty*, 70 F.3d 724, 728-29 (2d Cir. 1995) ("top hat plans were exempted on the premise that the employer's top-level executives have sufficient influence within the institution to negotiate arrangements that protect against the diminution of their expected pensions."). Therefore, the Court declines to read the contract against Mead. Indeed, Simpson was on notice of Mead's understanding that benefits began at age 62 from his termination letter. When negotiating his severance agreement, Simpson could have made this item a priority.

bona fide executives or high policy-making personnel under the provisions of the Age [D]iscrimination in Employment Act.

Payments will begin on the first day of the month that falls on or next follows the date you end your service with Mead.  Your benefit payment will be in any form (other than a lump sum) provided for in the qualified Mead plan in which you participate.

*B. Early Retirement.*  You can receive an early retirement benefit if you retire between ages 55 and 62.

Your early retirement benefit will be your basic retirement benefit–before the offsets are applied–but reduced by 1/4 of one percent for each month that your benefit precedes your 62nd birthday.  Then, the offsets discussed before will be made.

*When will early retirement benefits begin?*

You can receive your early retirement benefits on the first of the month on or after the date you terminate your services with Mead or as early as your 55th birthday, whichever is later.  Again, the forms of payment will be the same as those available to you under the qualified Mead plan in which you participate, *except for the lump sum payments*.  Procedures and conditions under the Mead Management Income Parity Plan will be the same as those under the qualified Mead plan.

*Separation or Early Retirement Without Company Consent Prior to Age 55*

In this case you cannot receive any benefit under the MMIP Plan before age 62.  Your basic retirement benefits under the Plan, before offsets, would be reduced three percent for each year prior to your reaching age 62.

Ex. C at 2.

The "technical" section of the plan then states:

*4.2 Early Retirement Benefits.*

(a) *Eligibility*. An Eligible Executive shall receive an early Retirement benefit under the Plan following termination of his service with the Company prior to his 62nd birthday.

(b) *Amount*. ...

(c) *Commencement and Form*. For early retirement between the ages of 55 and 62, or prior to age 55 with written Company consent, monthly early retirement benefit payments shall be paid as a straight life annuity commencing as of the first day of the calendar month coincident with or next following the latest of (i) the date an Eligible Executive terminates his service with the Company, (ii) his 55th birthday, or (iii) the first of any calendar month after his 55th birthday which he has elected in writing prior to the time of his early retirement. For retirement prior to age 55 without written Company consent, monthly early retirement benefit payments shall be paid as a straight life annuity commencing as of the first day of the calendar month coincident with or next following an Eligible Executive's 62nd birthday. Although the form elected my be different from that elected under the Qualified Plan, an Eligible Executive may elect an optional form of payment, other than a lump sum, using the same actuarial assumptions, from the optional forms available to him under the Qualified Plan. Election procedures and conditions under the Plan shall be the same as those under the Qualified Plan.

Ex. C. at 6.

Thus, if the plan allows for early retirement benefits "prior to age 55 with written Company consent" and Simpson is considered to have retired with company consent, he is eligible for benefits from age 55. It is possible, however, that "with written Company consent" is a condition placed upon the reception of benefits, rather than retirement. One may also conclude, as Mead urges, that receiving a pink slip does not constitute "retiring with written company consent." Simpson urges on the Court the former reading, further urging that his termination letter constitutes "written Company consent" to early retirement. Simpson buttresses his position by looking to the broader context of the plan's provisions, noting that much discretion was afforded Mead to enforce anti-competition provisions, concluding that the plan allowed for early retirement benefits to those

-18-

terminated prior to age 55 by a written letter was a provision "to soften the blow with the velvet glove of early retirement benefits for qualifying executives who are involuntarily terminated at a pre-retirement age." Doc. 27 at 6.

The Court concludes that the phrase "with written company consent," modifies the words following the comma. While Simpson is free in his personal affairs to refer euphemistically to having been fired as "early retirement with company consent," this does not seem a natural reading. Neither, of course, is Mead's reading of the contract a natural one. The contract is not ambiguous in the traditional sense of being readily understood in two or more ways; it readily provides no meaning.

The Court looks to the larger context of the contract for meaning. As for Simpson's contention that the contract makes early retirement benefits available as a "velvet glove," the Court sees evidence to the contrary in the provision immediately following 4.2, which allows the possibility of an eligible executive becoming disabled, unable to work, but unable to draw early retirement benefits after long-term disability had ceased, until he reached age 62:

> *4.3  Disability Retirement Benefits.*
>
> *(a) Eligibility*.  An Eligible Executive shall receive a disability retirement benefit under the Plan if he is Totally and Permanently Disabled as defined by the Qualified Plan.
>
> *(b) Amount*.  The annual disability retirement benefit, payable monthly, shall be equal to the basic retirement benefit less salary continuation or similar benefit from the Company, if any.
>
> *(c) Commencement and Form.*  Monthly disability retirement benefit payments shall begin as of the first day of the calendar month coincident with or next following the later of cessation of benefits from the Company's long-term disability plan or an Eligible Executive's 62nd birthday.

Ex. C at 6.  The Court hesitates to conclude that the 1982 plan provides a guaranteed safety net to those who are terminated prior to age 55, but not to those whom Mead would have wished to continue in employment were it not for unfortunate circumstances.

Even if the Court is mistaken in its reading of the disability provision, the Court also notes the explanatory "non-technical" Summary Plan Description.  Due to the lack of any clear meaning in the technical section under review, there is no possible discrepancy between the two parts.  According to the Summary Plan Description:

> You can receive an early retirement benefit if you retire between ages 55 and 62.[10] …
>
> * * *
>
> *Separation or Early Retirement Without Company Consent Prior to Age 55*
>
> In this case you cannot receive any benefit under the MMIP Plan before age 62.

Ex. C at 2.  Looking to this broader context, the Court concludes that Simpson was "separated" from Mead's employment.  The 1982 plan allows for early retirement benefits in this circumstance only if Mead provides written consent to the plan administrator.  Mead did not extend this consent to Simpson, as it had the discretion to do.  Therefore, the plan administrator was correct in denying Simpson benefits.  Judgment will be entered for Mead on this claim.

**B.     Claims II and III**

The second and third claims are premised upon the 1985 plan or the 1985 summary plan description governing the instant dispute.  Because the Court has already determined that the 1982

---

[10] Note that the answer is not "if you retire before age 62"; and no provision is made for retirement prior to age 55.

plan governs Simpson's request for benefits, the Court will enter judgement in favor of Mead on these claims.

## C.    Claim IV

Simpson also seeks damages for Mead's alleged failure to provide him with a copy of the 1982 plan in a timely manner, as allowed by 29 U.S.C. § 1132(c)(1)(B).  Doc. 23. ERISA § 502(c)(1)(B), 29 U.S.C. § 1132(c)(1)(B), provides that:

> Any administrator…who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1)(B).  Even negligence in responding to a retirement plan participant's request for plan documents constitutes breach of an ERISA fiduciary duty.  *Krohn v. Huron Memorial Hospital*, 173 F.3d 542, 547 (6th Cir. 1999), *McGrath v. Lockheed Martin Corp.*, 48 Fed. Appx. 543, 557 (6th Cir. 2002).  The imposition of penalties is entrusted to the discretion of the district court. *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1068 (6th Cir. 1994).  The statute authorizes penalties, but does not require them.  *Knickerbocker v. Ovako-Ajax, Inc.*, 187 F.3d 636, 1999 WL 551409, *4 (6th Cir. 1999).  Among the permissible factors that a district court may consider in exercising this discretion are: prejudice to the plan participants, bad faith on the part of the plan administrator, and the number of plan participants denied their rights.  *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1068-69 (6th Cir. 1994).  There is no requirement that a plan participant be prejudiced in order to impose penalties.  *Lampkins v. Golden*, 104 F.3d 361, 1996 WL 729136, *3 (6th Cir. 1996).  The

statute does not require a district court to take testimony or make any particular findings before

determining the propriety of a penalty.  *Id.* at *4.

      Mead Contends:

> 29 U.S.C. § 1132(c) imposes liability for failure to comply with a request for information upon the <u>plan administrator</u>; thus, even if Plaintiff's claim had been timely and the plan administrator had been required to provide an outdated plan, Plaintiff's claim against Mead as Plan sponsor fails.  *Caffey v. UNUM Life Ins. Co.*, 302 F.3d 576 (6th Cir. 2002).  Accordingly, Plaintiff's Motion for Judgment on his fourth cause of action should be denied.

Doc. 28 at 19.  Without a pinpoint cite, one is forced to peruse all of *Caffey* in order to verify what

one instinctively suspects: The plan administrator in *Caffey* was the plaintiff's employer, but

plaintiff had sued her employer's insurance company and not the plan administrator.  See *Caffey*,

302 F.3d at 578, 584-85.

      Mead asserts that "[t]he Plan designates 'the [Mead] Corporate Vice President – Human

Resources or any successor handling similar duties for the Company' as the Administrator.

…Robert Rosenberger, not Mead, was the plan's administrator.  Conversely, Mead, as the entity that

established the Plan, was the 'plan sponsor.'"  Doc. 28 n.17.  This is disingenuous at best and

borders on the frivolous.  Mead is fortunate that its actions provide a better argument against civil

penalties.  From reviewing the correspondence contained in the administrative record, the Court

finds that Mead's Human Resources Department made a good faith effort to provide the 1982 plan

documents.  Moreover, only one plan participant was affected.  Therefore, the Court declines to

impose penalties.

      Even if penalties were in order, Mead is on firmer ground in asserting that Simpson's claim

is barred by the statute of limitations:

-22-

> ERISA contains no statute of limitations governing claims under this section. As a result, this Court must look to the most analogous state statute of limitations. *Meade v. Pension Appeals & Review Comm.*, 966 F.2d 190 (6th Cir. 1992). [T]he closest analogous state statute of limitations is O.R.C. § 2305.11(A). Under this statute, "an action upon a statute for a penalty or forfeiture shall be commenced within one year after the cause of action accrues."

*Kumar v. Higgins*, 91 F. Supp. 2d 1119, 1123-24 (N.D. Ohio 2000).

Simpson last renewed his request for documents on January 26, 1999. Mead was required to provide documents by February 25, 1999. Simpson therefore had to bring his claim for failure to provide documents before February 25, 2000. Simpson filed his action in state court on July 30, 2001. Therefore, the statute bars the claim. For this reason, and because the Court would not exercise its discretion to award penalties on this claim in any event, judgment will be entered for Mead on this claim.

**E.     Claim V**

Because Simpson has not prevailed in any of his claims, his request for attorney fees will be denied. *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 828 (10th Cir. 1996).

**IV.     Conclusion**

Because Simpson was not entitled to early retirement benefits under the 1982 plan unless Mead consented, and because the 1985 plan and summary plan description do not govern Simpson's claim, and because Simpson's failure to provide documents claim is barred by the statute of limitations, and because the Court will not award attorney fees to Simpson, Defendant's Motion for Judgment on the Administrative Record, Doc. 30**,** is **GRANTED**, and Plaintiff's Motion for Judgment, doc. 27, is **DENIED.** The instant matter is **TERMINATED** from the docket of the Untied States District Court for the Southern District of Ohio, Western Division at Dayton.

-23-

**DONE** and **ORDERED** in Dayton, Ohio, on Thursday, April 21, 2005.


s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE